192 N.J. Super. 301 (1983)
469 A.2d 971
ESTATE OF GEORGE VAFIADES, BY ITS ADMINISTRATOR AD PROSEQUENDUM, ANGELO VAFIADES, MARY VAFIADES, VICKI VAFIADES BY HER GUARDIAN AD LITEM ANGELO VAFIADES, AND ANGELO VAFIADES, INDIVIDUALLY, PLAINTIFFS,
v.
SHEPPARD BUS SERVICE, INC. AND PATRICIA G. DRAIN, DEFENDANTS.
Superior Court of New Jersey, Law Division Cumberland County.
Argued October 14, 1983.
Decided October 20, 1983.
*304 Gerald M. Eisenstat, Esquire, Guardian Ad Litem (Shapiro, Eisenstat & Gabage, attorneys.)
EDWARD S. MILLER, J.S.C.
This case calls into question the actions of attorneys of another jurisdiction in their handling of a case in this state. It not only justifies the existence of R. 1:21-2 regulating pro hac vice admissions, it demonstrates the necessity for the court to control and scrutinize every request for such admission. It further displays professional conduct demonstrating and evidencing either a woeful lack of expertise or a dismaying lack of moral sensitivity or both.
This case arose as a result of a motor vehicle accident that occurred on March 8, 1982 in Millville, New Jersey, at which time plaintiff Angelo Vafiades was the owner of a car operated by plaintiff Mary Vafiades, which was struck in the rear by the bus of defendant Sheppard Bus Service, Inc. operated by its agent, Patricia Drain. At the time of the accident, the occupants of the Vafiades vehicle, in addition to the driver, were her children, Vicki Vafiades and George Vafiades, and a friend, Timothy Bruner. As a result of the accident Mary and Vicki Vafiades sustained personal injuries and George Vafiades was killed.
Immediately after the accident, plaintiff Angelo Vafiades, as a result of conversations with a neighbor, contacted a Florida attorney, Philip Auerbach, whom he did not know but who was known to his wife, Mary Vafiades. The Vafiadeses had not previously been represented by Auerbach. Vafiades testified that Auerbach advised that he could represent him in the matter in New Jersey. On March 15, 1982, Alan Neufeld, Auerbach's partner, flew to New Jersey and met Angelo Vafiades at the *305 Millville Hospital while Mrs. Vafiades was undergoing surgery. On that date Angelo Vafiades executed a retainer agreement. Neufeld explained the contingency fee schedule but did not give Vafiades a copy. Vafiades does not remember being advised he could retain counsel on a services rendered basis. Vafiades never saw Neufeld again and never met Auerbach. There is no evidence he ever signed a power of attorney.
Mrs. Vafiades testified she never saw Neufeld and that she first learned her husband had retained Auerbach right after her son's funeral. She recalled signing a retainer agreement after her surgery. She did not receive a copy of the retainer and did not sign a power of attorney. The retainer was never explained to her nor was she ever advised she could hire an attorney on a services rendered basis.
Neufeld then proceeded to obtain local counsel to "front" for him in this state. He contacted an attorney in Camden County, a previous acquaintance of his. A separate retainer agreement was never entered into with this attorney and, in fact, the Vafiadeses met him at his office on only one occasion.
Parenthetically, it should be noted that the court has been impressed with the sincerity and integrity of this young man. He has repeatedly demonstrated his concern, not only over his involvement, but even more for the welfare of the Vafiadeses. His only offense, if indeed it be an offense, was inexperience and misplaced trust in a friend. No censure, indeed praise, is expressed as to his conduct.
During the summer of 1982, Neufeld called the local attorney seeking general information and advising him that they had the case. His opinion was sought with respect to the value of the case, and later in the summer, he was asked to file a complaint to put some pressure on the insurance carrier. His only connection with the Vafiades was to arrange for the appointment of an administrator ad prosequendum and a preliminary meeting to answer interrogatories, which were never answered. He took no part in settlement negotiations as he was advised by Auerbach *306 and Neufeld that they wanted to handle negotiations. He never saw the contingency fee schedule signed by plaintiffs.
On November 5, 1982, he filed a motion to permit appearance of Auerbach and Neufeld pro hac vice with accompanying affidavits. The matter was returnable on November 19, 1982 and he was afforded an opportunity to be heard. By letter decision dated December 2, 1982, the motion was denied Burlington County Internal Medical Ass'n. v. American Medicorp, 168 N.J. Super. 382 (Law Div. 1979).
Vafiades stated that towards the end of 1982, after the pro hac vice application had been denied, he was advised by Auerbach that the case could be settled and was asked what he would accept as a good settlement. Vafiades told Auerbach of a figure that was acceptable. This figure was above the figure for which plaintiffs ultimately agreed to settle. There was no discussion prior to the settlement being reached of how the values of the various claims were to be determined or divided. It was the clients' understanding that the amount being negotiated was to compensate plaintiffs for all of the claims, direct and derivative, for personal injuries to Mrs. Vafiades and Vicki and the death of George Vafiades. The first information Vafiades received that the entire case was settled for $325,000 was in a call from Neufeld, who told what they had obtained as a settlement. Within an hour after his phone conversation with Neufeld, Vafiades received a phone call from a reporter for the Atlantic City Press, who told him of the settlement. (So much for the privacy of the Vafiades in their grief!)
By letter dated December 21, 1982, the attorney for defendants forwarded an original and two copies of a release to Mr. and Mrs. Vafiades. The release was executed before a notary public on December 27, 1982.
Subsequent to the signing of the release, an adjustor for the Hammonton, New Jersey office of the carrier that was handling the case received a call from American International Adjustment Company of West Orange, New Jersey and was told that *307 an oral commitment had been made to issue the settlement draft for $325,000 by the end of the year to Auerbach in Miami, Florida. The adjustor learned from her home office on the date of that phone call, December 28, 1982, that the funds had not yet been transferred, and she therefore waited until the next morning, December 29, 1982, at 9:00 to issue the check. She then called defendant's attorney to learn why the check was to be mailed to Florida and was not able to get an answer. She then spoke with Mr. Byrne, who instructed her to do what she was told; and the check was drafted and express mailed without cover letter on December 29, 1982 to Auerbach in Miami. Concern was expressed by Auerbach's office that the settlement check was not going to be received by the end of the year. However, the same was received and deposited to his account in Miami, Florida on December 31, 1982. The significance, tax-wise, is obvious.
As appears from the back of the settlement check, apparently Auerbach's office typed the estate endorsement and deposited it on the day it was received. While neither his name nor the name of his firm appeared on the face of the check, either Auerbach or someone in his office, without either written or oral permission from Vafiades, Mrs. Vafiades, or New Jersey counsel, signed their names on the back of the check and deposited it in his account.
Plaintiffs received a settlement check from Auerbach in the sum of $254,590 made payable to the order of Angelo and Mary Vafiades. At no time did plaintiffs ever receive a settlement statement delineating the expenses. Vafiades has stated that he understood the fee was computed by using the rate set forth in R. 1:21-7 plus an additional $2500 fee for the services of New Jersey counsel, who had been retained to file the suit in New Jersey. He never received an accounting of the costs incurred by Auerbach.
It was later learned that the contingency fee was computed on the full, or gross, $325,000 settlement without deduction for *308 the out-of-pocket expenses before computing the fee taken by Auerbach. In addition, the client was charged with the $2500 fee paid to New Jersey counsel, for additional legal research performed by another New Jersey attorney of $75, Neufeld's airfare to and from New Jersey of $347.75 and Auerbach's cost for travelling to Millville of $650. Except for long distance telephone charges of $225, photocopying charges at 50 cents a page of $122.75, medical records and reports of $65, there were no charges for a death certificate, investigation, actuaries' or expert reports. New Jersey counsel incurred out-of-pocket expenses for filing, services and subpeona fees totalling $240.
When the case was drawn to the court's attention, even a superficial analysis disclosed areas of judicial concern. These included, inter alia, the question of disbursement of that portion of the recovery that represented damages for the death of George Vafiades, bearing in mind the applicability of Green v. Bittner, 85 N.J. 1 (1980), to N.J.S.A. 2A:34-7; the propriety of the disposition of any claim of Vicki Vafiades without court approval; and the appointment of a proper general administrator of the Estate of George Vafiades, N.J.S. 2A:31-6. The court, therefore, appointed Gerald M. Eisenstat, a member of the bar of this state, as Guardian Ad Litem of Vicki Vafiades with instructions to investigate and report.
His report was filed with the court on September 1, 1983 and all interested parties were served with copies. Acting on the recommendations of this report, the court issued an order to show cause returnable October 14, 1983 to determine the following:
1. Judicial determination of the case of Vicki Vafiades.
2. The apportionment of the balance of the recovery between Mary Vafiades and the Estate of George Vafiades.
3. The appointment of a general administrator for the Estate of George Vafiades.
4. Division of the proceeds of the net wrongful death benefits for the Estate of George Vafiades.

*309 5. The propriety of compelling Auerbach and Neufeld to return such sums to plaintiffs as shall be determined they are entitled to in conformity with the computations made in the report.
On the return day of the order to show cause, Mr. and Mrs. Vafiades and Vicki Vafiades appeared, as did New Jersey counsel, counsel for defendant Sheppard Bus Service and its carrier, and the Guardian Ad Litem. The factual accuracy of Eisenstat's report was conceded by all of the above.
On October 5, 1983, Neufeld wrote the court indicating that neither he nor Auerbach would appear, Auerbach purportedly being on his honeymoon, and Neufeld because he claimed he was required to oversee the office in Auerbach's absence, although he did agree to remain in his office where he could be available for a telephone conference. Accordingly, the matter is ripe for decision.
First, the actions of Eisenstat, who acted in this case on a pro bono basis, and who consistently declined to accept a fee, are worthy of the highest praise this court can give. His preparation was a model of thoroughness and his report a model of organization. The recommendation, concededly accurate, was thorough and complete.
Second, the court adopts and will follow the recommendations of the report in their entirety. It is obvious that the proper evaluation of any negligence case includes a judgment call both as to amount and the matter of distribution under the death act. The solution recommended by the Guardian Ad Litem works substantial justice, does injustice to no one, and is acceptable to the Vafiadeses. It is adopted in toto.
Despite the fact that Auerbach and Neufeld touted the recovery as the largest in Southern New Jersey "for the wrongful death of a minor", it is simply untrue. The breakdown is $170,000 for Mary Vafiades, $150,000 for the death of George Vafiades, and $5,000 for Vicki Vafiades. The settlement, while sizable, is not record breaking. It does not, of course, justify or excuse the conduct of Auerbach and Neufeld.
*310 Third, it must be repeated that New Jersey counsel is not to be held responsible for the actions of his Florida correspondents. He was as much manipulated by them as were the Vafiadeses.
There remains for discussion the actions of Auerbach and Neufeld. Their actions were improper in many respects. As reported by the Guardian Ad Litem, they were guilty of many procedural violations:
They violated R. 1:21 defining the practice of law in this state. There is no doubt that Auerbach and Neufeld handled this case from Florida in exactly the same way they would have done had they been local counsel, except that they then would have then been more amenable to our disciplinary procedures.
Disciplinary Rules of the Code of Professional Responsibility of the American Bar Association as amended by the New Jersey Supreme Court provide:
A lawyer shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction.
R. 1:21-1, which governs the practice of law in New Jersey, provides that:
No person shall practice law in this state unless he is an attorney, holding a plenary license to practice in this State, is in good standing and maintains a bona fide office for the practice of law in this State regardless of where he is domiciled.
With limited exception, a person without a plenary license to practice in New Jersey is not permitted to appear and prosecute an action in any court of this state unless he is a real party in interest to the action or the guardian of the party or pursuant to R. 1:21-1(a)(2) "has been admitted to speak pro hac vice pursuant to R. 1:21-2;". The same rule goes on to provide:
No attorney authorized to practice in this State shall permit another person to practice in this State in his name or as his partner, employee or associate unless such other person satisfies the requirements of this rule.
The representations of Auerbach to Vafiades, when asked whether he could handle the matter in the State of New Jersey, which was a response in the affirmative, were, unless otherwise conditioned, inappropriate. The subsequent entry into a contract *311 or retainer on March 15 with Vafiades for the rendering of services in New Jersey by Neufeld and then subsequently by Auerbach with Mrs. Vafiades in June, 1982 was inappropriate and in violation of R. 1:21 defining the practice of law in the State of New Jersey.
The very fact that application for appearance pro hac vice was made on behalf of Auerbach and Neufeld by New Jersey counsel is further evidence of their awareness of the fact that they could not otherwise be permitted to represent Mr. and Mrs. Vafiades in this jurisdiction. After having been advised of the fact that the court would not permit their appearance pro hac vice and had denied the application, Auerbach and Neufeld continued to represent plaintiffs in this cause by continuing negotiations with the insurance company for defendants and arriving at a settlement. They thereafter directed the preparation of a release, the execution of the same, and the delivery of the settlement check from New Jersey to Florida. There the check made payable to the Estate of George Vafiades by its administrator ad prosequendum, Angelo Vafiades and Mary Vafiades, and Angelo Vafiades and Mary Vafiades and New Jersey counsel, for $325,000 was endorsed without oral or written authorization from any of the payees named on the settlement draft. Auerbach thereafter deposited it into his account and disbursed from that account in the State of Florida.
In addition to the court rules governing the practice of law in New Jersey, N.J.S.A. 2A:170-78 declares that any person not licensed as an attorney who engages in the practice of law in New Jersey, or holds himself out to the public, either alone or together with any other person, as entitled to engage in the practice of law, or a rendering legal service or advice, or is furnishing attorneys or counsel in legal actions or proceedings of any nature is a disorderly person. The statutes and Rules of Court are intended to protect the citizens of New Jersey from permitting a person to hold himself out to practice law in New Jersey, since there is no control over such person nor his disbursal *312 of funds absent a trust account or a business account with a financial institution in this state. Similarly, it would appear that rendering of advice to plaintiffs in this matter by Florida counsel as to the various factors involved, including the amount they would be entitled to recover, was clearly the practice of law.
R. 1:21-7 provides in (b):
An attorney shall not enter into a contingent fee arrangement without first having advised the client of the right and afforded the client an opportunity to retain him under an arrangement whereby he would be compensated on the basis of the reasonable value of the services.
Auerbach and Neufeld violated that provision of the rule. The contingent fee agreement that was drafted for and signed by plaintiffs did not indicate that they were so advised. Plaintiffs' testimony in depositions indicates that they were never so advised.
That same rule provides that distribution of the proceeds of a contingent fee arrangement pursuant to R. 1:21-7(c):
* * * shall be computed on the net sum recovered after deducting disbursements in connection with the institution and prosecution of the claim, whether advanced by the attorney or by the client, including investigation expenses, expenses for expert or other testimony or evidence, * * *.
The rule further provides that when representation is taken on behalf of a husband and wife or parent and child in a derivative action or when a claim for wrongful death is joined with a claim on behalf of the decedent, the contingent fee is to be calculated on the aggregate sum of the recovery.
It is apparent that the contingent fee in this matter which was taken from the total amount recovered, without any deduction for out-of-pocket expenses, was excessive under our rules.
R. 1:21-7(g) additionally provides that a contingency fee arrangement is to be signed by both parties and that a signed duplicate is to be given to the client. The same was apparently never received by Mr. or Mrs. Vafiades. It was only after the appointment of the guardian that demand was made upon *313 Auerbach and Neufeld that they provide the same when the same was finally forwarded. The same paragraph provides that at the conclusion of the matter resulting in a recovery, the attorney shall prepare and furnish the client with a signed closing statement in such form as described by the Administrative Director of the Courts. At no time did Mr. and Mrs. Vafiades receive an accounting from Auerbach and Neufeld, the same again being received only after having been requested by the guardian.
The computation of the fee retained by Auerbach and Neufeld further violated the Disciplinary Rules, specifically DR 2-107 governing the division of fees among lawyers. Deducted from the amount that would ordinarily have been received by plaintiffs was the fee for $2500 of New Jersey counsel. DR 2-107(A) provides that a lawyer may divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office only when the client consents to employment of the other lawyer after a full disclosure that a division of fees will be made and that the total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered the client. The amount distributed to plaintiffs attorneys exceeded the reasonable fee provided by R. 1:21-7 to the extent the same did not take into consideration the claim of a minor with a 25% contingency, was computed on the gross sum prior to the deduction of expenses, and also had deducted from plaintiffs' share the amount paid to New Jersey counsel.
The adult plaintiffs testified that at no time prior to their having been advised of the amount their case was settled for was there any agreement reached relative to how the net proceeds were to be distributed or allocated between the several claims. DR 5-106(A) provides that:
A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his client, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the *314 total amount of the settlement, and of the participation of each person in the settlement.
Settlement of this cause by Auerbach and Neufeld violated this rule inasmuch as an aggregate settlement was made for parties who had different claims composing all of the proposed settlement. In addition, Auerbach and Neufeld further picked up the representation of Timothy Bruner, the minor. No action has yet been brought in his behalf, so defendants have not yet bought their peace with respect to the whole case. Here, again, is a representation of conflicting interests.
None of the negotiations toward the ultimate settlement of this case was conducted between Auerbach and the attorney for defendant. To the contrary, it appears that the negotiations took place after denial of Auerbachs' and Neufeld's application to appear pro hac vice and were conducted directly with the insurance company for the defendants. DR 7-104 provides that during the course of his representation of a client, the lawyer shall not:
"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."
There is no evidence that such was ever granted by defendant's attorney. Auerbach and Neufeld were obviously in violation of our court rules and were in violation of the several Disciplinary Rules enumerated.
Auerbach and Neufeld deducted certain items from the amount plaintiffs were entitled to receive as part of the net proceeds of the settlement. These were grossly improper. For example, the rule does not provide for airfare from Neufeld or Auerbach to obtain a retainer. Charges for long distance telephone calls, xeroxing and postage are office overhead and not deductible from the recovery. The cost of legal research and the $2500.00 paid to New Jersey counsel are similarly not proper charges against plaintiffs under R. 1:21-7. Only costs totalling $293.50 are properly charged against plaintiffs.
*315 The court approves the judgment for Vicki Vafiades in the sum of $5000. Counsel is thus entitled to a fee of 25%. The recovery, $320,000 (minus out-of-pocket expenses), would entitle counsel to a maximum fee of $66,437.37 under R. 1:21-7.
Since the allowable counsel fee is $66,437.37, a net is apportioned to the clients of $258,562.63. Since counsel remitted but $254,590.00, a shortfall of $3972.63 exists and is due Vafiades.
Auerbach and Neufeld have consistently refused to return any portion of their fee to this state. This court will therefore order them to refund $3972.63 to Vafiades and in the event of their refusing to do so, the court requires the insurance carrier for the defendant to do so.
The court cannot fail to note that Auerbach and Neufeld repeatedly refused to comply with any request of this court and notes their failure to attend a hearing wherein their professional skills and ethical conduct were drawn into question. [It further notes that they had little trouble getting to New Jersey (at the Vafiadeses' expense) when they had a chance to get the case].
The saddest single aspect of this case is the complete blindness of these men to the legal, ethical and moral implications of their conduct. Far from being concerned for their clients or even their own professional conduct, they defiantly insisted upon their own self-proclaimed abilities and righteousness. Thus, on October 5, 1983, Neufeld advised the court:
I think our letter of September 20, 1983, clearly reveals not only were the clients not charged excessively, but that a refund may in fact be in order to this firm for undercharging. Obviously, a refund is not our intent because we purposely minimized our fee.
That they obtained some measure of success does not justify or excuse them. The end does not justify the means nor permit such cavalier disregard of the highest standard of our profession. It is indeed a paradox that New Jersey attorneys are strictly regulated (to some degree at their own expense), R. 1:20, while foreign attorneys who are not under the same limitations engage in this type of conduct. It is more than mere provincialism that mandates strict application of R. 1:21-2 and Burlington *316 County Internal Medical Assn. v. American Medicorp, supra. It is the very real necessity, demonstrated by this case, for the courts to vigilantly scrutinize such conduct so that the practice of law in this state does not degenerate into a jungle.